## Case No. 2,559.

### CERTAIN LOGS OF MAHOGANY.

[2 Sumn. 589.][1]

Circuit Court, D. Massachusetts. May Term, 1837.

CHARTER PARTY—RIGHTS OF THE PARTIES—ADMIRALTY—JURISDICTION—PLEADING—LIS PENDENS — PROCEEDINGS IN STATE COURT — LIEN FOR FREIGHT—WAIVER—RIGHTS OF SHIPPER — PERSONAL LIABILITY FOR FREIGHT.

1. The admiralty has jurisdiction over charter-parties for foreign voyages, and will enforce the lien thereof.

[Cited in Thatcher v. McCulloh, Case No. 13,862; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420; U. S. v. The Reindeer, Case No. 16,144.]

2. An objection, grounded on the pendency of another suit, for the same cause of action, is preliminary in its character, and should be taken in admiralty by a special plea, in the nature of a plea in abatement, known, in the practice of the admiralty, as a dilatory or declinatory exception.

[Cited in Benary v. The Prince Albert, Case No. 11,426; The Grace Darling, Id. 5,651.]

3. The objection of lis pendens can be sustained only, where the two suits are of the same character, and where the plaintiff in both suits is the same.

[Cited in Atlantic Mut. Ins. Co. v. Alexandre, 16 Fed. 281.]

4. A suit in a state court by replevin, or by an attachment of the property in question, cannot supersede the right of a court of admiralty to proceed by a suit in rem, to enforce a right, or lien against that property.

[Cited in A Raft of Spars, Case No. 11,528; Ashbrook v. The Golden Gate, Id. 574; The Isabella, Id. 7,100. Dissenting opinion in Taylor v. Carryl, 20 How. (61 U. S.) 605. Distinguished in Taylor v. The Royal Saxon, Case No. 13,803.]

5. The general owner of a ship will be deemed owner for the voyage, notwithstanding a charter-party, if he retains the possession and control of the navigation of the ship during the voyage, and if the master is his agent, acting under his instructions. So also, if the intention of the parties, with regard to this point, seems doubtful on the face of the charter-party.

[Cited in The Aberfoyle, Case No. 16; Raymond v. Tyson, 17 How. (58 U. S.) 60; Hill v. The Golden Gate, Case No. 6,491; Donahoe v. Kettell, Id. 3,980.]

6. The lien on the cargo for freight is recognised by the common law and maritime law; but it may be displaced by particular circumstances, which denote a clear and determinate abandonment.

[Cited in Maxwell v. The Powell, Case No. 9,324; The Hyperion's Cargo, Id. 6,987; Duncan v. Kimball, 3 Wall. (70 U. S.) 43.]

7. A clause in a charter-party, providing, that the freight shall be paid "in five days after her (the brig's) return to and discharge in Boston" is not a waiver or displacement of the lien for freight; the word "discharge" merely referring to the unlading, and not to the delivery of the cargo.

[Cited in Sears v. Bags of Linseed, Case No. 12,589; The Bird of Paradise, 5 Wall. (72 U. S.) 557. Approved in Kimball v. The Anna Kimball, Case No. 7,772. Distinguished in The Santee, Id. 12,328.]

8. Semble. A shipper has a right, by the maritime law, to examine the goods after they are unlivered in order to ascertain whether they are damaged or not, before he makes himself liable at all events for the freight.

[Cited in Fox v. Holt, Case No. 5,012.]

9. Where by the charter-party the freight was a gross sum payable on the successful close of the whole voyage, and the bill of lading declared, that the return cargo should be delivered to the shipper or his assigns, they paying freight, as per charter-party; held, that a lien attached to the homeward cargo for the freight due from the whole voyage; also, that the consignee by his receipt of the goods, became personally liable, upon his implied assumpsit, for the whole freight.

[Cited in The Panama, Case No. 10,703; Raymond v. Tyson, 17 How. (58 U. S.) 63; The Hyperion's Cargo, Case No. 6,987.]

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. This was the case of a libel in rem brought against a certain cargo, consisting principally of mahogany, claimed by the respondent and laden on board of the brig Sterling, owned by the libellants, to recover the amount of the freight due and earned on a foreign voyage under a charter-party, which, as the libellants contended, gave them, under all the circumstances, a lien on the same cargo for the amount of such freight, which they were entitled to enforce in the present proceeding. The charter-party was entered into on the 18th of October, 1836, at Boston, between G. P. Richardson, as agent and owner of the brig, and Thomas N. French, for a voyage from Boston to port or ports in the West Indies, from thence to the city of St. Domingo and back to Boston (not exceeding three ports used in all), where she was to be discharged, the dangers of the seas excepted. After the outward cargo was taken on board and before the brig sailed on the voyage French failed in business, and the cargo (which was shipped on his account), was attached by French's creditors. It was then agreed between French and the respondent, that he should relieve the cargo from the attachments, and that for his indemnification he should have the control and management of the cargo, during the voyage, and that the homeward cargo should be shipped and consigned to the respondent by the firm of Joseph Mansfield & Co. (which firm the supercargo, who had been previously appointed such by French, was a member), who were the consignees of the outward cargo. The written instructions for the voyage were given by G. P. Richardson for the owner, and were approved by the respondent. By the bill of lading of the outward cargo it was deliverable to Mansfield & Co. or to assigns, "he or they paying freight for the goods as per charter-party." The voyage was duly performed and the homeward cargo was shipped by Mansfield & Co., and by the terms of the bill of lading was made deliverable "to the order of the shippers or assigns, he or they paying freight as per charter-party;" and the bill of lading was afterwards sent endorsed by the shippers to the

[1] [Reported by Hon. Charles Sumner.]

respondent. It was, under this consignment, made in pursuance of the original agreement with French, that the respondent claimed the homeward cargo for his indemnification for debts and liabilities· exceeding its full value. Upon the arrival of the brig at Boston the libellants gave notice to the respondent, that they were ready to deliver the cargo to him upon his payment, or upon security for payment, of the freight due by the charter-party; otherwise they should proceed to discharge the cargo and detain the same until the expiration of five days from the discharge, and then take such steps as they should be advised in the law to obtain the charter money. The respondent, upon receiving the notice, declined to accede to the terms. The cargo was accordingly landed and put into the possession of Mr. Mackay, a wharfinger, as bailee for the libellants. The respondent immediately afterwards brought a writ of replevin, which was sued out of the state court by the respondent, against the wharfinger under which the cargo was replevied; and, the five days having expired; the present libel was filed against the cargo and the same was taken into the possession of the marshal, and afterwards delivered to the respondents, upon giving bail according to the course in the admiralty. Upon the answer and proofs a decree was rendered by the district judge in favor of the libellants [case not reported], and an appeal was taken from that decree by the claimant and respondent.

C. P. and B. R. Curtis, for libellants.

Henry H. Fuller, for claimant and respondent.

STORY, Circuit Justice. . The answer of the respondent insists upon various grounds. In the first place, that the court, sitting in admiralty, has no jurisdiction over the case. But since the decision of this court in the case of The Volunteer [Case No. 16,991], the objection would be deemed unmaintainable; and it has now been waived at the argument. In the next place, the respondent relies on the pendency of the replevin suit, as a good defence against the libel, as it is substantially, as he contends, for the same cause of action; and the parties are not to be harassed with successive suits upon the same cause of action at the same time. To this objection several answers may be given, each of which is equally conclusive against it. (1) The objection is in its own nature a mere declinatory or dilatory objection in the nature of a plea in abatement; and not peremptory, as a bar on the merits. It being preliminary in its character it should have been taken, if at all, by a special plea in the nature of a plea in abatement, known in the practice of the ecclesiastical and admiralty courts by the appellation of a dilatory or declinatory exception, which is always brought forward before the contestatio litis, or general defence in bar, or general answer

upon the merits. See 1 Brown, Civ. & Adm. Law, 464–470; 2 Brown, Civ. & Adm. Law, 361–369, 414, 415; Law, Forms Ecc. Law, pp. 167–170, tits. 78–81. (2) But, if this could be overcome, there is another objection to it, founded upon the different character of the two suits. The parties to the replevin are not the same, as in the present suit. The wharfinger is the sole defendant in that suit, and he is no party to the present suit. Then, again, the suits are not of the same nature; the replevin is founded upon a supposed tort; the libel upon a supposed contract. It is possible, nay it is probable, that many questions of the same nature may arise in each suit. But it never can be judicially affirmed, that all the questions in a suit founded in tort, and in the one founded in contract are, or must necessarily be the same; and that no others can arise. Then, again, the replevin, though in form in rem, acts in personam as to the judgment. But the libel is solely and exclusively in rem. The replevin is founded on the right of property in the thing. The libel insists upon no property, but upon a mere lien. (3) Then, again, a suit in a state court by replevin, or by an attachment under process, of the property, can never be admitted to supersede the right of a court of admiralty to proceed by a suit in rem to enforce a right against that property to whomsoever it may belong. The admiralty suit does not attempt to enter into any conflict with the state court, as to the just operation of its own process; but it merely asserts a paramount right against all persons whatever, whether claiming above or under that process. No doubt can exist, that a ship may be seized under admiralty process for a forfeiture, notwithstanding a prior replevin or attachment of the ship then pending. The same thing is true as to the lien on a ship for seamen's wages or a bottomry bond. 3. But if this objection also could be overcome, there is another entirely fatal; and that is, that the plea of a prior lis pendens applies exclusively to the case, where the plaintiff in both suits is the same, and both are commenced by himself; and not to cases, where there are cross suits by a plaintiff in one suit, who is defendant in the other. The slightest examination of the doctrines of the common law on this subject will satisfactorily establish the conclusiveness of this objection to the exception. See Bac. Abr. "Abatement," M; Sparry's Case, 5 Coke, 61; Com. Dig. "Abatement," H 24. I might add, that if the respondent had originally commenced a suit in the admiralty for the supposed tort, and afterwards for the same cause of action had sued out a replevin in the state court, upon the principles decided in the case of Dudfield v. Warden, Fitzg. 313, if applicable to our courts, the lis pendens in the admiralty could not in the state court have been urged as an objection to the replevin. In every view of the matter then, this exception is untenable.

We come, then, to the main or substantial ground of controversy upon the merits; and that is, whether there is a lien upon these goods for the freight earned. If there be, I have no doubt, that it is within the competency of the district court, as a court of admiralty, to enforce it upon the principles stated in the case of The Volunteer [supra], and what I cannot but deem the ancient and legitimate jurisdiction of the admiralty. Let us proceed at once, then, to the question of the lien. That there is generally a lien on the cargo for the freight, is not disputed; and indeed, it is equally acknowledged in the common law, and in the maritime law, as is abundantly shown in the authors cited in The Volunteer [supra]. If, then, the circumstances of the present case do not displace that lien, it must be treated as a subsisting lien. And I accede to the argument urged at the bar, that the onus probandi is on the respondent to establish a waiver, or extinguishment of the lien. Three grounds have been relied on for this purpose. 1. That by the charter-party, French, the charterer, became owner for the voyage. 2. That if not, the terms of the charter-party are repugnant to the notion of any existing lien, as the freight is not to be paid until after a contemplated delivery of the cargo to the respondent. 3. That at all events the homeward cargo is not liable for the freight due for the whole voyage; and, at most, only for the freight due on that cargo in the return voyage.

In the first place, then, was French, the charterer, upon the true interpretation of the charter-party, owner for the voyage? I shall not attempt to go over the authorities on this subject, since they are fully collected and their result stated in the case of The Volunteer [supra]; to which, therefore, I take leave generally to refer. There are two decisions, however, to which I wish especially to refer, the one English, the other American. In the case of Colvin v. Newberry, 6 Bligh, (N. S.) 189, Lord Tenterden, in moving for an affirmance of a judgment in the exchequer chamber upon the question, who is to be deemed owner for the voyage (and which judgment reversed his own in the king's bench), used the following language: "Two propositions of law are clear, as applicable to a case like the present. The first is the common case of goods shipped on board of a vessel, of which the shipment is acknowledged by a bill of lading, signed by the master, that, if the goods are not delivered the shipper has a right to maintain an action against the owner of the ship. The other proposition, which is equally clear, is this; that if the person, in whom the absolute property of the ship is vested, charters that ship to another for a particular voyage, although the absolute owner appoints the master and crew, and finds provisions, and every thing else, and is to receive from the charterer of the ship a certain sum of money for the use and hire of the ship, an action

can be brought only against the person, to whom the absolute owner has chartered the ship, and who is considered the owner pro tempore, that is, during the voyage, for which the ship is chartered. In such a case the action cannot be maintained against the person, who has let out the ship on charter, namely the absolute owner." So that, according to this decision, the fact, that the absolute owner appoints the master and crew, and finds provisions for the voyage, will not alone control the other words, if there is by them a clear letting to charter of the whole ship; but the charterer will be deemed the owner for the voyage. On the other hand, the supreme court of the United States, in the case of Marcardier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 49, where the same question arose, used the following language: "A person may be the owner for the voyage, who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command, and navigation of the ship. But where the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo on freight, the charter-party is considered as a mere affreightment, sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership." Perhaps, there is no real discrepancy between the doctrines held in each of these cases; and, with reference to the facts, each may be perfectly correct. In the former case the master was the charterer, and not the absolute owner. In the latter the master was the absolute owner, and entered into the charter-party, he being to continue master during the voyage. The charter-parties too contained very different and special provisions. In the former case, although there were no express words of demise, yet the court thought, that, upon the whole terms of the instrument, taken together, there was in effect a letting of the whole ship to the master for the voyage, notwithstanding she was to be victualled and manned at the expense of the absolute owner. But, if there be any real discrepancy between these cases, I have no difficulty, independently of my official duty, to obey the decisions of the supreme court, in saying, that I deem the American decision built upon the more solid and satisfactory distinction. I agree, that it is not indispensable, to constitute the charterer the owner for the voyage, that express terms of demise and letting of the whole ship should appear on the face of the charter-party; but that it may be gathered, as a result, from the whole stipulations in the instrument. I also agree, that the clause, that the absolute owner shall appoint the master and crew, and victual, and provision, and equip the ship during the voyage, is not of itself necessarily conclusive, that he retains the ownership during the voyage; and that the provision is controllable by other stipulations, showing a

clear intention, that the charterer shall be owner for the voyage. But I do consider such a stipulation, as very strong primâ facie evidence in favor of the absolute owner, that he is deemed to be the owner for the voyage, and that it will require very cogent circumstances to overcome it. In short, it appears to me, that, if the absolute owner does retain the possession, command, and control of the navigation of the ship during the voyage, and the master is deemed his agent, acting under his instructions for the voyage, though authorized and required to fulfil the terms of the charter-party, the absolute owner must, under such circumstances, be still deemed owner for the voyage, and be liable as such to all persons, who do not contract personally and exclusively with the charterer by a sub-contract with the latter, knowing his rights and character under the charter-party. This seems to me the natural, and, indeed, the necessary result of the doctrine stated in Marcardier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 49, and McIntyre v. Bowne, 1 Johns. 229, and Gracie v. Palmer, 8 Wheat. [21 U. S.] 632, 633; Id. [Case No. 10,692]. The same view of this subject is taken by Mr. Chancellor Kent in his very learned Commentaries. See 3 Kent Comm. (3d Ed. 1836) pp. 137, 138, lect. 45. See, also, Abb. Shipp. (Story's Ed. 1829) p. 22, and note; Id. pp. 172–176; Christie v. Lewis, 2 Brod. & B. 410. And it stands confirmed by the decision in Taggard v. Loring, 16 Mass. 336, and in Clarkson v. Edes, 4 Cow. 478. My brother, the late Mr. Justice Washington, in his excellent opinion in the case of Gracie v. Palmer, has collected the main authorities, and commented on the true results to be deduced from them with his usual clearness and accuracy; and the supreme court on the appeal supported and approved his opinion. So that, whatever of minute differences or distinctions or discrepancies are to be found in the English cases on this subject, in America there is a general uniformity of decision upon the principles and distinctions already stated.

Let us now proceed to the consideration of the terms of the present charter-party, in order to ascertain, what is their true meaning and interpretation. If, upon comparing the various clauses, we are led to the conclusion, that it is doubtful, whether the charterer was intended to have the sole possession and control of the brig during the voyage, or to be constituted owner for the voyage, then the general owner must be deemed such; for his rights and authorities over the voyage must continue, unless displaced by some clear and determinate transfer of them. The charter-party purports to be between George P. Richardson, as agent and owner of the brig Sterling, of which one Treat was the master, and Thomas A. French; and witnesseth, that Richardson, for the consideration thereinafter mentioned, "hath letten to freight all the aforesaid brig,

with the appurtenances to her belonging, for a voyage to be made from Boston to port or ports in the West Indies; from thence to the city of St. Domingo, and back to Boston, not exceeding three ports used in all, when she is to be discharged, the dangers of the seas excepted." It then proceeds to state, that Richardson covenants, that the brig shall be tight, staunch, and strong, and apparalled during the voyage; that it shall be lawful for French, his agents and factors, as well at one place as at another, to load on board of the brig a full loading of goods and merchandise, as they shall think proper, contraband goods excepted. In consideration thereof, French agrees to pay in full for freight or hire of the brig, "the sum, of six hundred and fifty dollars per calendar month, payable in five days after her return to and discharge in Boston." Richardson further agrees "to pay the charge of victualling and manning the brig," and French "to pay all lighterage, port charges, and pilotage during the voyage, and to deliver said brig, on her return to Boston, to the owner aforesaid or his order." Then follows this clause: "It is understood, that one passenger in cabin the charterer has the liberty of putting in, he finding his own small stores. The charterer to load the vessel at Boston, and the owner to discharge the cargo on her return. Should any funds be required for disbursements in a foreign port, to be advanced the captain on account of the charter." The parties then bind themselves for the true and faithful performance of their covenants and agreements in the penal sum of two thousand dollars.

Such are all the material clauses in the charter-party. And it must be admitted, that they are somewhat indeterminate in their nature and character, so far as they affect the ownership for the voyage. The language in the beginning imports a present demise of the ship for the voyage. It is, that the owner lets to freight the brig for the voyage. But this does not necessarily import, that the possession is given up to, and taken by the charterer. Whether so intended, or so by operation of law, will essentially depend upon all the terms of the instrument taken together. This is very clearly established by the decisions cited by Lord Tenterden in his excellent treatise on Shipping (Abb. Shipp. pt. 3, pp. 173–178, c. 1, § 6). On the other hand, the clause of covenant by the owner (who had appointed the master,) that the ship should be tight, &c., and that he should pay for the victualling and manning during the voyage, is not necessarily decisive (as has been already intimated) the other way. The clause, that the charterer should have the liberty of putting a passenger on board in the cabin, does, indeed, favor the construction, that the owner was to retain the possession of the brig by his master during the voyage. So also the clause, that the owner should discharge the

cargo on the brig's return to Boston. On the other hand, the clause, that the charterer should deliver the brig on her return to Boston, to the owner or his order, does strongly imply, that the charterer was to have possession during the voyage up to that time. So that, from the obscurity of the phrases, and the apparent contradictory presumptions arising from these various clauses, it is really somewhat difficult to say, what was the absolute intention of the parties. And, then, upon the doctrine already stated, on the footing of the doubt what the parties did intend, the owner must be deemed to continue owner for the voyage. It is not an unimportant circumstance, also, in the actual posture of the case, that the acts of the parties under the charter-party conform to this view of the matter, and put this construction upon it. It distinctly appears, that the sole instructions for the voyage were given by the owner, and not by the charterer; and that the respondent acquiesced in what the owner assumed to be his right and duty, the giving of the orders for the whole voyage to the master, as his agent, without any interference by the charterer. But it appears to me the less necessary to decide the case on this point, because it is manifest, that the owner, and not the charterer, was to have the possession of the brig immediately on her return to Boston, and was, as owner, to discharge the cargo; and the freight was not payable until five days after such discharge. So that, in the most unfavorable aspect of the case for the owner, the possession of the brig and cargo were to be in him upon the brig's arrival at Boston, and he was to discharge the cargo. And thus his possession became coupled with his lien for the freight, if it existed, in the same way and to the same extent, as if he had had possession of both during the whole voyage.

We are, therefore, led to the consideration of the second point already stated; and that is, whether there was, under the circumstances, a lien on the homeward cargo for the freight. That there was such a lien, unless waived or displaced by the agreement of the parties, has been already affirmed; and, indeed, is upon principle, as well as upon authority, incontrovertible. The clause, in the charter-party, relied upon by the respondent as a waiver or displacement of the lien, is that, which provides, that the freight shall be paid "in five days after her (the brig's) return to and discharge in Boston." The argument of the respondent is, that, by the word "discharge," as here used, is meant, not an unlivery or unlading merely of the cargo, but a delivery of the same to the charterer, or owner of the cargo. The argument on the other side is, that by the word "discharge" is meant a mere unlading or unlivery from the brig, without any reference to a delivery to the owner. And, certainly, in a general sense, as well as in a nautical sense, the proper meaning of the word "dis-

charge," with reference to a cargo, is to unlade it from the ship. So it will be found stated in Johnson's Dictionary, and Falconer's Marine Dictionary. The word, therefore, in its appropriate sense, being perfectly significant in the place, where it occurs, that meaning is not to be departed from, unless a different use of it is manifestly intended in the clause in question. I see no reason for any such construction. On the contrary, it seems to me, that the appropriate sense is here, as matter of intention, to be presumed from the circumstances, rather than any wider or different sense. It is well known, that the goods of the shipper may not only be detained for freight, properly so called, but also for the hire agreed to be paid by the shipper under a charter-party for the use of the ship, if the owner of the ship retains possession of the cargo; and that the shipper cannot ordinarily insist on a delivery of the goods to him, until the freight or hire is paid or secured, according to the terms of the agreement. See Abb. Shipp. pt. 3, p. 168, c. 1, § 7; Id. pp. 246, 247, c. 3. But, then, the owner is not at liberty to insist, that the goods shall not be landed before such payment or security is made. On the contrary, the shipper has a right, as it should seem, by the maritime law, to insist upon examining the goods, after they are unlivered, in order to ascertain, whether they are damaged or not, before he makes himself liable at all events for the freight. Under such circumstances, an unlivery of the cargo becomes perfectly proper; and after it is made, the owner of the ship has a right to detain it in his custody, until the payment of or security for the freight. So the law is laid down in Lord Tenterden's Treatise on Shipping (Abb. Shipp. pt. 3, pp. 247, 248, c. 3, § 11); and it appears to be the general rule adopted by foreign maritime nations. In the marine ordinance of Louis XIV. (1 Valin, lib. 3, p. 665, tit. 3, art. 21), it is expressly prescribed, that the master shall not retain the merchandise on board his vessel for default of payment of the freight. But he may, at the time of the discharge, refuse to deliver it, or cause it to be held for the freight. Valin gives, as the reason, that it would be absurd to allow the master to insist upon the payment of his freight before the goods were examined, and the damage, if any, ascertained. The modern Code of Commerce of France (lib. 2, tit. 8, art. 306) contains a provision very similar in its purport and objects. It declares, that the master shall not retain the merchandise on board of his ship for default of the payment of freight. But he may, at the time of discharging, insist upon having them deposited in the hands of a third person, until the freight is paid. The commentators give the same reason for this provision, which is assigned by Valin. See Boucher, Instit. de Droit Marit. (1803); Santayra, Code de Comm. art. 306, note; Locré, Esprit du Code

de Comm. art. 306, note (2 Lucré, p. 211); Pardessus, Droit Comm. pt. 3, tit. 4, c. 2, art. 719.

Now, I cannot but think, that the very object of the clause, that the brig should be delivered to the owner on her return to Boston, and that he should discharge her, was intended to fasten his lien for the freight or hire under the charter-party, by enabling him to discharge the cargo, and retain it, until the freight was paid. At least, this is a natural explanation of the object of the clause, which, in any other view, would seem either superfluous or of little legal importance. It is not at all improbable, that the commercial embarrassments of French were suspected at the time, when the charter-party was entered into. But, at all events, his known failure at the time, when the cargo shipped was put under the control of the respondent, and the owner's agreeing to allow the brig to go the voyage, without any farther security than that derived under the original charter-party, favor this construction, especially as it appears, from Capt. Treat's testimony, that there had been some objections made by the owner to proceeding on the voyage; and in reply to a suggestion made by the respondent, the owner said, "that there was no need of any misunderstanding; that he was willing, that the brig should go the voyage, provided they would pay him for it." This was said in the presence of the respondent, of French, and of Mansfield, the supercargo. So that the demur about proceeding on the voyage seems to have been occasioned by French's failure, and the consequent arrangements made with the respondent. It seems to me in a high degree improbable, that the difficulty about the freight could have been overcome without some collateral security, if it had not been already well understood by all the parties, that the cargo then on board was, and by the arrangements made, the homeward cargo also, would be, subject to the lien for the freight. It would be so subject, if the discharge of the cargo, referred to in the charter-party, was construed to be a mere unlading thereof, and not an unconditional delivery to the consignee or respondent. The bill of lading for the homeward voyage does, in my judgment, greatly fortify this interpretation of the understanding of the parties. By the terms of it, the homeward cargo was to be delivered at Boston, the dangers of the seas only excepted, "unto the order of the shippers or assigns, he or they paying freight for the said goods as per charter-party." By the very terms of the instrument, then, the delivery was not to be, until the freight was paid according to the provisions in the charter-party, that is to say, "in five days after (the brig's) return to and discharge in Boston." The natural interpretation of this language, taken together, is, that the shipper or his assigns will pay the freight or hire in five days after the cargo is unladen by the owner, if the latter will, at the time of the payment

deliver the cargo to the shipper or his assigns. In this way, all the words in the charter-party and the bill of lading have their usual and appropriate meaning. But if "discharge" means delivery, there will be, at least, a seeming repugnancy between the two instruments. By the bill of lading, the payment of freight is to be a contemporaneous act with the delivery; but by the charter-party, it is to be five days after the delivery. I am aware, that this repugnancy may be avoided, or at least mitigated, by construing the words, that when the cargo is delivered, the payment of freight shall be in five days after such delivery. But this construction is less consonant to the just import of the words, and would defeat the right of the owner to any lien for freight; a lien, which is favored in law, and ought not to be displaced without a clear and determinate abandonment of it.

Then, as to the remaining point, to what extent the homeward cargo is liable for the freight or hire. The argument is, that the homeward cargo (if at all) is not liable for any freight beyond what accrued and is properly due from itself for the return voyage; and, therefore, the freight must be apportioned. I am of a different opinion. By this charter-party, the freight or hire was a gross sum, payable on the successful close of the whole voyage. The bill of lading declares, that the return cargo shall be delivered to the shipper or his assigns, they paying freight as per charter-party. The shipper and his assigns, therefore, agree to pay the whole freight, for the whole voyage, upon the delivery of the cargo to them, according to the terms of the bill of lading; and I am unable to see, upon what grounds they can escape the obligations of their own contract. It is common learning, that where goods are consigned to a party, he paying the freight stipulated in the bill of lading, the consignee, by receiving the goods, is bound to pay the freight; and the law charges him upon his implied promise to pay it. In this view of the matter, if there were no lien at all, still the respondent would, upon clear principles of law, be personally liable for the payment of the whole freight or hire due by the charter-party, upon his receipt of the goods, upon his implied undertaking, even if he were now to be treated as the absolute owner of them. But, so far as the transactions between him and French are disclosed, he seems to stand as a mere substitute of French, and as holding the title of the goods under him, as security for debts and liabilities incurred by him for French, and not as absolute owner; and a fortiori in such a case he is bound to pay, what French would be bound to pay, since he must accept the goods cum onere. On this account I have not been able to perceive upon what substantial grounds the respondent can rest his present defence: for if he should succeed here, he would still remain bound to pay the full freight of the voyage

upon his implied assumpsit as consignee. It would, therefore (as was said by a great judge, on another occasion), only be changing postures on an uneasy bed. It seems to me, that on this part of the case the decisions in Faith v. East India Co., 4 Barn. & Ald. 630, and Small v. Moates, 9 Bing. 574, have a very strong bearing.

Upon the whole, my opinion is, that there is a lien for the whole freight or hire, due under the charter-party, on the return cargo; and, therefore, the decree of the district court is affirmed, with costs.