## HECKSCHER and others *vs.* McCREA.

Where a party contracts to load a ship to a given amount of tons, at a stipulated price per ton, and falls short in shipping the *whole number* of tons, the owner or master of the vessel is entitled to recover, in the nature of *damages,* freight for the deficiency; but where in such case goods are offered by a third person, to be shipped to an amount sufficient to make up the deficiency, though at a reduced rate of compensation, but still at the current prices, the owner or master of the vessel is bound to receive such goods, and place to the credit of the original charterer the net earnings of such substituted cargo, after making all reasonable deductions resulting from the circumstances of the case.

ERROR from the superior court of the city of New-York. On the 14th April, 1833, a contract in the nature of a charter party was entered into between McCrea, the plaintiff in the court below, and two mercantile firms of the city of New York, viz: C. A. & E. Heckscher, and Low, Wilson & Co., the defendants in the court below, whereby McCrea engaged to despatch the ship *Mary,* from *New-York* to *Canton,* and back to New-York,

with liberty to touch and trade at *Manilla,* and to ship in the vessel from Canton or Manilla, merchandize consigned to the two firms, to the amount of $22,500, upon the gross sales of which, they should be entitled to a commission of five per cent, including a guaranty. In consideration whereof, the two firms engaged to ship on board the *Mary,* at Canton or Manilla, merchandize to the amount of 330 tons measurement, upon which they would pay a *freight* of $32 per ton, measurement of 40 cubic *feet, 60 days from the arrival of the vessel in New-York. The    [ *305 ] ship to remain in Canton 90 days, for the purpose of unloading and loading. The *Mary* arrived at *Whampoa,* (the usual place for loading and discharging cargoes at *Canton,*) on 27th January, 1834. Merchandize belonging to the Messrs. Heckscher to the amount of 200 tons, was shipped on board the Mary for her return voyage, but as to the remaining 130 tons, their agents declined to furnish the merchandize, except 5 tons, though called upon to do so by the agents of McCrea. After much correspondence on the subject, the agents of the Messrs. Heckscher, at Canton, on the 21*st April,* addressed a note to the agents there, of McCrea, inquiring whether they were willing to have the residue of Messrs. Heckscher's tonnage in the Mary *filled,* and the freight *specified* in the bill of lading, at $20 per ton, with the understanding that the rate of freight proposed by them should not interfere with the arrangement made between the parties at home. This offer was declined by the agents of McCrea, on the ground that they were not authorized to receive goods on any terms, other than at the rate of $32 per ton. The *Mary* left Canton on 28th *April,* on her return home, having received on board only *five tons* of silk, as a portion of the 130 tons, there being ample room for the remainder. At the time of the *offer,* thus to fill . up the quantity of 130 tons, at a freight of $20 per ton, the agents had no goods on hand belonging to the Messrs. Heckscher or to the other firm, but they had upwards of 200 tons of tea under their control, which they were authorized by the owners thereof, to ship to the United States, at the *current rate of freight,* which was then $20 per ton, and which was shipped by other vessels at that rate of freight. Upon this state of facts, McCrea brought an action of *assumpsit* against the other parties to the contract, claiming to recover the amount of *deficient freight.* The judge instructed the jury, that the captain of the ship was not bound to take on board at Canton, goods belonging to persons *other* than the Messrs. Heckscher, and to sign bills of lading therefor at a less rate of freight than that stipulated for in the agreement; and if he was so bound, still that the letter of the agents of the 21st *April, did not in judgment of law amount to such an    [ *306 ] offer or tender of freight, as imposed on the captain the obligation to take such goods on board. The defendants excepted to the charge, and the jury found a verdict for the plaintiff, for $5,200, on which judgment was entered. The defendants sued out a writ of error.

*F. B. Cutting & J. Anthon,* for the plaintiffs in error, insisted that the agents of the plaintiffs below were bound to have received the cargo proposed to be substituted upon the terms offered, as by so doing, $20 out of every $32 of the tons deficient would have been saved, and no possible injury would have accrued to their principal, as his rights under the original contract were expressly proposed to be reserved.　They cited *Abbott on Ship.* pt. 3, ch. 1, § 3, *and ch.* 7, § 2 ; *Holt on Ship.* 322, 475 ; 13 *East,* 566 ; 10 *id.* 379 ; 1 *Taunt.* 300 ; 5 *Maule & Selw.* 180 ; 4 *Barn. & Ald.* 50 ; 18 *Johns. R.* 157 ; 2 *Sumner,* 589 ; 6 *Pick.* 248 ; 4 *Cowen,* 478 ; 8 *Cranch,* 49 ; 3 *Campb.* 202 ; 6 *Bingham,* 190.

*J. Prescott Hall & D. Lord, Jun.,* for the defendant in error, insisted that the letter of the agents of the defendants under date of the 21st April, 1834, was not an *offer* of any merchandize, nor *notice* of any being ready for shipment ; it was a proposal for a *new agreement* on behalf of new parties.　It was not an offer of merchandize for shipment *on behalf of the defendants,* and was not binding, because accompanied with a condition variant from the contract.　And at all events the master was not bound to accept the proposal.　They cited *Lawes on Ship.* 344, 118, 122, 316 ; 2 *Taunt.* 285 ; 2 *Sumner,* 589, 600 ; *Cro. Eliz.* 172 ; 2 *Saund.* 837 ; 3 *Johns. R.* 342 ; *Abbott on Ship. pt.* 3, ch. 1, § 19.

*By the Court,* COWEN, J.　This is an action for dead freight, which the plaintiff below claimed to have earned under a special contract.　The plaintiff agreed to allow a space of 330 tons measurement in the ship Mary, on her return voyage from China to New-York ; the defendants on [ *307 ] their part *to fill so much of the ship and pay $32 per ton.　The ship lay at Canton for the term stipulated, in the course of which time she received cargo from various shippers ; and, among others, the defendants filled up 200 out of their 330 tons.　As to the residue, which all parties relied would be filled by Low, Wilson & Co., there was a failure, if we except the trifling amount of silk furnished by Russel & Co., who it is agreed were the sole agents of the former at Canton, and were looked to by all concerned as the only persons who were expected to fill the 130 tons. This was as well known to Blight & Co., the plaintiff's agents, and to the master of the Mary, as to any other person.　All the defendants resided in the city of New-York, and to them the ship was to be consigned.　A good deal of intercourse by way of notes or letters and otherwise passed between Blight & Co., who had the charge of the plaintiff's business at Canton in respect to the cargo of the Mary, and Russel & Co. ; and by the 21st of April, about a week before the time fixed for her departure, all prospect having failed that Low, Wilson & Co. would be able to perform, Russell &

Co. proposed, on their own account, to fill the space at $20 per ton, bills of lading to be signed accordingly, under a stipulation that the transaction should not interfere with the original contract. This was declined, on the sole ground of Blight & Co. having no authority to consent that the bills should stand at less than $32. In consequence of this refusal, in which the master participated, the Mary came home, for so much, an empty ship ; and the defendants below have been subjected in damages to nearly two thirds more than if the plaintiff's agents had thought themselves warranted in taking the goods at the freight proposed. No want of good faith is perhaps, imputable to any one concerned. The failure of Low, Wilson & Co. to supply the goods, doubtless arose from accident ; and the refusal to receive the goods proposed as a substitute, seems to have turned on a scruple of the master, who supposed that his signing bills of lading at $20 would annul the stipulation for $32 contained in the freight contract.

It may be conceded that if the offer of goods by Russell & Co. had proposed them *in fulfillment of the stipulation* in "the con- [ *308 ] tract, it would have been the duty of the plaintiff's agent to refuse them on such terms. A tender of payment or performance must always be unqualified ; and in the case of cargo tendered under a charter party, this is in general especially important, because, by signing bills for less than the stipulated freight, though it may not affect the owner's personal remedy against the merchant, the master may lose his lien for the balance. The owner is entitled not only to the security of the charty party ; but to the additional right of lien for the whole freight which grows out of the nature of the contract. It was upon this ground that Lord Ellenborough proceeded in the case of *Hyde* v. *Willis*, 3 *Campb.* 202. The defendant stipulated by his charter party to furnish a full cargo of sugar, and pay freight at the rate of 10s. 6d. per cwt. ; but on the ship arriving at Jamaica, his agent tendered the sugar, insisting that bills of lading should be signed at 10s. That was held to be a defective tender ; that the master might treat it as a refusal to perform ; might regard the contract as broken, and recover for dead freight. Lord Ellenborough did not say, however, that the bill of lading being signed in the terms proposed would discharge the defendant from his personal stipulation to pay 10s. 6d ; and clearly it would not have any such effect. He said the master must deliver the goods, on payment of the freight mentioned in the bill of lading. This must have been, because it so provided by its own terms ; but such delivery would be in no way incompatible with a remedy by action for the agreed amount of freight in the charter party. The right of lien is merely to secure what is due for the labor of the ship ; it is for the benefit of the master or owner, and may, like any other security, be waived by the party to be benefitted, without impairing his right to a remedy by action. *Abbott on Ship.* 280, 281, *et seq. Am. ed.*

*of* 1829, *and the cases there cited.* It is entirely clear, therefore, that even if goods should be accepted and bills of lading signed at a rate inferior to that fixed by the charter party, it could in no way affect this beyond the right of lien arising from it. In the case at bar, it is quite doubt-

[ *309 ] ful whether the stipulation as to the *time of payment did not waive that right ; it postpones the time 60 days after the arrival of the goods in New-York—a term which was probably altogether beyond a reasonable one for their discharge and delivery. If that were so, the lien was waived according to all the cases. *Chase* v. *James*, 5 *Maule & Selw.* 180. *Crawshay* v. *Homfray*, 4 *Barn. & Ald.* 50. *Chandler* v. *Belden*, 18 *Johns. R.* 157. *Certain logs of mahogany*, 2 *Summ.* 589.

But I forbear to pursue the inquiry as to the rights and obligations of these parties in their course towards a compliance with the contract. I agree that the owner and his agents might insist on its exact terms, at least the substance of them, being followed. The question, I think, is not alone whether Blight & Co. or the master were bound to take the goods offered by Russell and Co in *performance.* All idea of performance had by this time been abandoned by both sides. It was completely ascertained that Low, Wilson & Co. could not fill the 130 tons, and the ship was not even bound to remain till the lay days had expired with any view to performance. *Blight* v. *Page*, 3 *Bos. & Pull.* 295, *note.* *Abbott on Ship.* 428, *Am. ed. of* 1829. And if there were nothing more in the case, the master might have immediately weighed anchor and sailed for home. The defendant's contract might be considered as, *pro tanto*, already broken and the master absolved from the duty of all further stay.

The more grave question is, however, whether, under such a concourse' of circumstances, the master did not owe another duty to the defendants which he has unwarrantably refused to discharge. By failing to perform, and that promptly, I admit the defendants had already subjected themselves to an action for damages. That they do not deny ; but it by no means follows that where a man has hired out the services of his person or his property at a stipulated price, and the employer has failed to perform, the employee may, either by lying still, or omitting to engage otherwise in the general line of his business, as a matter of course subject his employer to a payment of the whole contract price. We lately had occasion to consider this

[ *310 ] rule as applied to canal freight in *Shannon* v. *Comstock*, 21 *Wendell*, 457. And I will only repeat as to the general ground, the remark of Mellen, Ch. J., in a case there cited : " If the party entitled to the benefit of the contract can protect himself from a loss arising from a breach, at a reasonable expense, or with reasonable exertions, he fails in his social duty if he omit to do so regardless of the increased amount of damages for which he may intend to hold the other contracting party liable." A doc-

trine so sound in morals, I never could have suspected to be wanting in any department of the law, till I heard it denied as to maratime contracts by the candid and able counsel who argued for these defendants in error. Even they admitted that the case at first struck the court below, much as we told them it did us upon the argument; and I cannot suppose that the decision we are called to review must have finally turned upon a course of technical reasoning, perhaps an application of positive authorities which I have not been able to regard as at all controlling the question. On the contrary, I have looked into the rule of damages for breach of charter parties as laid down by Abbott on Shipping and other books ; and so far as I have been able to discover, especially in those which treat of the English rule, they accord with the general one laid down by the Ch. J. of Maine. When the merchant is not ready to lade on board, the master is at liberty, and may recover damages. *Molloy B.* 2, ch. 4, § 3. *Jamieson* v. *Laurie, Abb. on Ship.* 185, *Am. ed. of* 1829 ; 6 *Bro. P. C.* 474, *Toml. ed. S. C. Thompson* v. *Inglis*, 3 *Campb.* 428. *Kleine* v. *Catara*, 2 *Gallis.* 61, 74, 5. That is to say, in effect, the vessel becomes a general ship, and the master may contract with another. And this is said by *Molloy*, even though part of the lading be put on board. *Abbott* says, he ought not to take in other goods, if the ship be freighted by the agent, without the merchant's consent, unless he be insolvent, in which case the master may take other goods to secure his freight. This distinction rests on the ground that the responsible merchant, upon whom the loss is to fall, may take it upon himself and order the ship to sail. *Abbott on Ship.* 178, *ed. before cited.* It may be admitted as a general rule that, in a case of the breach supposed, the master or    [ *311 ] owner shall be entitled to recover as damages freight for the entire deficiency. *Duffie* v. *Hays*, 15 *Johns. R.* 327. *Thomas* v. *Clarke*, 2 *Stark. R.* 450. *Abb. on Ship.* 277, 8, *ed. before cited*, § 2, *and the cases there cited.* The question is, however, under what circumstances the merchant may demand that his case be made an exception. One clearly is where the master has in fact taken other goods and made a profit. In such case, unless there be something specially against it in the charter party, the profit is received and allowed by way of recoupment. This is so plain as to be assumed in the last edition of *Abbott* which I have seen. The book says the remedy for the breach of a general covenant to load the ship is an action for damages, in estimating which a deduction is to be made for such benefit, if any, as the master might derive from bringing the goods of other persons. *Abb. on Ship. pt.* 3, ch. 1, § 13, *b, p.* 199. *ed. of* 1829. The case of *Bell* v. *Puller*, 2 *Taunt.* 285, was cited on the argument of the case at bar to prove the contrary ; but the place now cited from *Abbott* is a commentary on that case, and distinguishes it from a general covenant to

load. In that case, there was a special stipulation, that, on failure to load the ship, the charterer should pay a particular sum, and the ship be at liberty to return. That was held to release the claim to recoupment of what the ship had earned after the failure. The case goes to confirm the general rule. Indeed, on a like special clause coming in question a short time before, in the king's bench, it was not thought to take the case out of the general rule, *Puller* v. *Staniforth*, 11 *East*, 232; though that court afterwards agreed with the decision in the common pleas. *Puller* v. *Halliday*, 12 *id.* 494. So, says Abbott, section last cited, p. 200, there is a rule in the French ordinance, importing that " the merchant who does not load the goods mentioned in the charter party, shall nevertheless pay the freight as if the whole had been laden." Yet he adds, at the commentary both of *Valin* and *Pothier*, on this rule, that, if the master procure goods from other persons, the freight that he derives of them shall go in diminution of the sum to be paid by the merchant; *for the ordinance awards the whole to him only by way of indemnity. All this is said of a hiring of the whole ship by the merchant, which I take to be a stronger case against him than a partial hiring, or contract to supply only a part of the cargo. The rule, therefore, applies more clearly in the latter case ; the authorities are more numerous, more direct and speak with less caution as to the course of the master in taking freight from third persons. The remarks in Abbott, edition before cited, 199 to 201, apply to the breach of a covenant, both for a general and partial loading. At page 277, the book lays down the rule thus : " And where again he has covenanted to furnish a complete lading, or a specific number of casks or bales, and failed to do so, he must make good the loss which the owners have sustained by the failure, to be settled in case of disagreement, by a jury, who will take all the circumstances into their consideration, and make due allowance to the merchant, for the profit which the master may have made by bringing the good of other persons, if any have been brought." This rule was distinctly asserted by Story, J. on a stipulation for part of a cargo, in *Kleine* v. *Catara*, 2 *Gallis.* 61, 66, and I cannot find that it has ever been doubted, where the charter party does not itself fix a different rule of damages. This is sometimes done, as I before noticed ; and where the covenant is partial, a French ordinance allows the withdrawal of the goods by the merchant on paying *a moiety* of the freight. *Abbott*, 200, *ed. before cited.* A special clause may be seen in *Robertson* v. *Bethune*, 3 *Johns. R.* 342. There it was that, if the charterer failed to furnish a certain portion for a return cargo, he should pay $1,300 for the freight of the outward cargo. Such ordinances and stipulations all imply, what the books assert, that the damages may by no means come up to the freight agreed. The government in

one case and the parties in the other, seek to liquidate them by positive provision. A recovery is, in the latter case, had under the notion of stipulated damages. In the case at bar, there was no such stipulation; there was no statute; and there can be no doubt that had the master taken the freight offered by Russell & Co. it would, in legal effect, *have    [ *313 ] saved to the defendants twenty dollars out of thirty-two dollars of each ton remaining unoccupied.

But the master chose to decline taking it. We have so far examined his right only. Having the power to rescue the shippers from more than one half the damages arising from their misfortune, (for no fraud is pretended,) was it his duty to do it? It appears to me that Lord Tenterden answers this question directly, in *Abbott on Ship.* 428, *ed. before cited, pt.* 3, *ch.* 11, § 2. He is speaking particularly of a merchant hiring a ship to go to a foreign port, and covenanting to furnish a lading there, but his performance being prevented by a prohibition'of the foreign government against exportation. After citing cases to show that his obligation is not thereby dissolved, as it would be by a prohibition of the merchant's own government, the book adds: "But in such case, *or if the default be owing to the personal neglect or inability of the freighter, and not to any general cause, the master on his arrival at the port of lading, should obtain another cargo, if possible, from other persons, and not sullenly hoist sail and depart, in order to charge the merchant with the whole freight. And if, upon the ship's arrival, he is informed that the merchant is unable to furnish the lading, he cannot, by waiting the time appointed in the charter party, charge the merchant with the demurrage.*" It is scarcely necessary to add that the learned writer thus puts the very case at bar, and applies the very principle cited from the opinion of Mellen, Ch. J. and which we applied as the rule of damages for violating an agreement to furnish freight for a canal boat, in *Shannon v. Comstock.* The same rule in substance was asserted in an earlier edition by Lord Tenterden himself. *Vide Am. ed. of* 1822. Both the books were edited here by Mr. Justice Story, who seems judicially to approve of the rule in question by what he said of it in *Kleine v. Catara,* 2 *Gallis.* 75. The case of *Blight* v. *Page,* 3 *Bos. & Pul.* 295, *note,* is relied on in both editions; and that branch of the decision which denies all allowance to the master for demurrage does contain a principle sufficient to warrant the rule in the full extent to which it is laid down by the last edition of Abbott. It *shows not only that the master has a    [ *314 ] duty to perform, but that if he do not perform it, and on the contrary, so conduct without necessity, and on full notice, as to enhance the mischief under a belief that the freighter must bear all the loss, he cannot recover in respect to damages thus incurred, thus drawn upon himself by his own voluntary unnecessary act. In the language of Lord Kenyon, there would be *no pretence for damages.*

True, the master must be governed according to circumstances.   In case of a China ship, her lay-days nearly out, with a valuable cargo already on board, bound on one of the longest voyages in the world, I agree there was little or no chance to search out goods for the 130 tons.   A short inquiry for them was all that could be exacted.   But the goods were laid in his way.. Freight was low; and he could not expect the $32 per ton.   Russell & Co. offered at the same rate which they afterwards paid to another ship.   No two men can differ on what sound morals required of the owner and master. The only excuse in this respect, was the fear entertained of dissolving the original contract.   But the duty was more than one of mere imperfect obligation.   The master would have been legally bound to take the goods whether offered by Russell & Co. or a stranger.   I understand the offer as being made of their own goods.   The refusal was the more unaccountable inasmuch as Russell & Co. offered to do all in their power to obviate the scruple which was started.   Some little latitude in so serious a matter should be accorded to the foreign agent.   There was nothing in the contract requiring the shipment to be of the defendant's own goods.   They therefore had a right to underlet their share in the ship, at the contract price, or at a still higher rate.   *Michenson* v. *Begbie*, 6 *Bing*. 183.   And why not for a lower rate, without prejudice to the owner's original claim?   In the case cited, the sub-contract was compared to an underletting by a lessee.   What difference to the landlord, if his rent be secure, whether his tenant get more or less than the original rent?   The case at bar comes very near in princi-

[ *315 ]  ple to that in *Bingham*, which is reported more at large in 3 *Moore & *Payne*, 442.   But independently of that, take the rule of Lord Tenterden, that the master should obtain another cargo *if possible*, and it is clear the verdict below was too large by more than half.   Much was said in argument of the inconvenience to which masters will be subjected, by thus making their ship a general one.   Among others, the loss of lien secured by the charter party was repeatedly mentioned ; and I have admitted all the force that objection can claim.   It is confined to an offer of performance.   If it have any force, it must lie there. The question of indemnity, is entirely another matter.   The proposed bill of lading might provide for a lien *pro tanto*.   Surely that would not be diminishing the security.   It was safer for all concerned.   Goods subjected to a lien for only a portion of the original freight were better than an empty ship.   Their receipt on still more unfavorable terms might, under the circumstances, have been an object with both owner and freighter.   Suppose there had been a total failure of all contract cargo ; was the ship to return empty because freight had fallen in the market?   The right of lien if there were any, remained as to all the goods on board upon the 21st of April ;

and an acceptance of the offer would probably have enlarged it. At all events, it would have added to the security for that portion of the freight covered by the contract of the defendants. Then, it is said, thus making the ship general and forcing goods on the master, would make him a common carrier and collector for as many persons as the freighter may choose to let in under his contract. That again is supposing the freighter to make the offer in the name and right of his contract. In what manner he might under-let would be one question; and if any very serious prejudice were like to ensue to the general interests of the voyage, or the ship, that might be an argument against taking the substituted goods in any view. Here, the agents and master would not stop to inquire how that matter was under the offer of Russell & Co. They at once took the ground of no authority to receive goods under the most convenient arrangement. Beside, if, in order to mitigate damages, the goods are received upon a new contract onerous and expensive *beyond the terms of the original [ *316 ] charter party, that would take from the amount to be deducted.

The rule of assessing damages, as laid down for such a case by the last edition of *Abbott, pt.* 3, *ch.* 1, § 13 *b, p.* 199, *Am. ed. of* 1829, is thus : " In estimating the damages, the jury would make a deduction for such benefit, if any, as the master might derive from bringing the goods of other persons, but if he should have been obliged to return empty, they would award damages equivalent to the sum that would have been payable by the merchant for a full cargo : taking care on the one hand that the master should lose nothing, and on the other hand that he should gain nothing by the breach of the merchant's contract.

The objection as to the form of the offer from Russell & Co. is answered. by the nature of the master's duty. That was to seek for freight and obtain it if possible. Of course he was bound to make the suggestion that it could be had, coming from persons respectable as Russell & Co. appear to have been, the foundation for inquiry and final acceptance of such freight as it might lead to, if that could be obtained on reasonable terms. He was bound to meet any offer more than half way.

I think, on the whole, that the plaintiffs in error have reason to complain of the rule of damages adopted by the court below ; and, for that cause, the judgment should be reversed ; a *venire de novo* to go from that court, the costs to abide the event.