SAMUEL D. STONE and Others, Respondents, v. FRANKLIN WOODRUFF and Others, Appellants.

*Charter party — liability of the hirer who cannot furnish freight — the master is not bound to proceed to a port not designated in the charter party for it — nor bound to wait for a cargo — measure of damages.*

Under a general charter party, where there are no special provisions, the merchant who hires the ship is bound to load it (although, owing to an unforeseen circumstance, no cargo can be had), and in case of a failure so to do, to pay for the ship "empty for full;" nor is the master, where there is no cargo at the place of destination, under any obligation to proceed elsewhere to obtain it.

The measure of damages, where the cargo is not furnished, is the amount of the freight under the charter party, less the expense of earning it and less any freight earned by the ship during the time.

*Semble*, that where the charter party provides that the vessel shall be loaded "quick dispatch," the master, who upon arriving at the place designated is advised that a cargo cannot be had, is not bound to wait for a cargo which it is expected can be furnished within a short time.

Appeal by the defendants from a judgment, entered upon the verdict of a jury, and also from an order denying a motion for a new trial made upon the minutes of the court before which the action was tried.

*Welcome R. Beebe*, for the appellants.

*Harrington Putnam*, for the respondents.

Brady, J. :

This action was brought upon a charter party dated July 11, 1879, of the brig *Tubal Cain*, then lying at Boston, bound for Demerara. It was provided that the brig, after discharging at Demerara, should proceed to Turk's Island and there load with quick dispatch and bring to New York a full cargo of salt in bulk, at a freight of seven cents per bushel. The master received at Demerara a copy of the charter party and a letter ordering the salt from Frith & Murphy ; and accompanying these was a letter from the defendants, stating that if Frith & Murphy could not load the vessel, he was to buy it from whoever would sell it for the lowest price and draw upon them at twenty or thirty days for the cost; and in this letter it

was also stated that the price ought not to be over eight cents a bushel, and that they would like him to see that Frith & Murphy made the price the lowest it could be bought for on the island. Frith & Murphy were also advised that the vessel had been chartered and received their advices previous to the vessel's arrival.

It appears by the evidence, also, that the salt season of 1879 lasted from April to November at Turk's Island, and had been exceptionally bad in consequence of continuous rains, which prevented evaporation; that for four weeks prior to September ninth, which was the date of the *Tubal Cain's* arrival at Turk's Island, there had been no salt to load the vessel; and that during that period several fishing vessels had left the island, without first obtaining cargoes of salt. It also appears that there was a steam mail communication between New York and Turk's Island, which took four or five days for a passage, and that there was a mail service by way of St. Thomas, connecting regularly with Turk's Island by packet. And it further appears that telegraphic communication also existed, but was interrupted temporarily when the *Tubal Cain* arrived.

As already suggested, the brig arrived on September ninth at Grand Turk, which is only an open roadstead, although the chief place in Turk's Island. After the arrival of the vessel, the master, on landing, presented the ship's documents and reported his readiness to load. This occurred on the tenth of September. Mr. Frith, in response, said: "I am sorry to see you, captain; I was in hopes you wouldn't come for three or four weeks; there is no salt on the island nor in the colony." Mr. Frith then suggested to the captain that he should go to an island in another group, about 180 miles off, called Inagua, which the captain declined to do, because it was a deviation from the charter party, but said he would do so, provided a new charter was made. This was refused.

It appears further that upon the afternoon of that day, Mr. Frith took the master to see Mr. Hutchings, the editor of the local newspaper at Turk's Island, to whom he was accustomed to resort for advice, and the whole subject was presented to him for his consideration in the presence of the persons named. He announced his conclusion that he knew of no other course than for the master " to lay there and leave when his time was up." There is some

dispute, it may be observed here, as to how long a time it would require to load the vessel with salt, whether it would occupy between three and four days or take a week.

It further appears that Mr. Frith, realizing that he could not load the vessel, took the master to another salt dealer to get him to charter the vessel with salt, and who, as well as two others who were applied to, declined to employ the brig. 'It also appears that salt is the only export from the colony, and further that Mr. Frith said there might be salt in another week at East Harbor, which was in Caicos Islands, about twenty miles off, but to which the master had been told by his pilot that it would be dangerous to go, a fact which he communicated to Mr. Frith, at the same time offering to stay at Turk's Island, provided a cargo was guaranteed and the lay days and demurrage indorsed upon his charter party. This proposition was refused, Mr. Frith declaring that he would not guarantee a cargo in two weeks or two months.

After the occurrence of these incidents and all efforts to obtain a cargo at Turk's Island having been abandoned, on the sixteenth of September, the master determined to leave; and with this object in view he asked Mr. Frith for a letter certifying that no cargo was to be had. This request appears to have been in writing and was personally delivered by the master, the contents of which may be inferred from the reply which Mr. Frith immediately wrote and handed back and which is as follows:

"TURK'S ISLANDS, <em>Sept.</em> 16, 1879.

"CAPT. S. D. STONE, *Master of Am. Brigt. Tubal Cain* :

"DEAR SIR — In reply to your letter of this date, we regret to state we cannot furnish your vessel with a cargo of salt, as the same cannot be purchased in the colony, but should you feel disposed to remain until next week, we can furnish you with a cargo at East Harbor, providing if the present weather continues.

"Respectfully yours,

"FRITH & MURPHY.

"DARRELL & Co., 83 *Pearl Street, New York.*"

The vessel left on the following day, viz., the seventeenth of September, and arrived at New York in about ten days, having

remained at Turk's Island, it would appear, for about six days after reporting, viz., from the tenth to the seventeenth of September.

A reference to the pleadings shows that the complaint alleges that, in pursuance of the charter party and in performance thereof, the vessel proceeded to Turk's Island, where she arrived on the 9th of September, 1879, in ballast, and where the master immediately delivered his order or letter of instructions to Messrs. Frith & Murphy, and that they failed to provide or furnish a full cargo of salt or any cargo whatever; that the vessel remained at Turk's Island the usual and customary number of days for vessels receiving cargo, and not being able to obtain any, returned to the port of New York; and after alleging the quantity of salt necessary for a full cargo, demanded judgments for the amount of the freight, according to the terms of the charter party.

The defendants alleged as a defense that, at the same time the master received his letter of instructions, they also delivered to him a further letter of instructions in which he was authorized to buy the cargo of salt if Frith & Murphy could not load the vessel (which letter has already been referred to); and, further, that upon the arrival of the vessel at Turk's Island, the master was requested by Frith & Murphy, to whom he reported, to await the cargo of salt at that port, or to proceed, as was customary and proper, with his vessel to Inagua, a place within Turk's Island, and there to take on board the cargo of salt ready to be laden on board the vessel; and that, notwithstanding such request, he refused to await a reasonable and customary time for the cargo of salt, or to proceed to Inagua, or to buy cargo as directed, but returned to the port of New York without the cargo or any part of it, by reason of which the plaintiffs were guilty of a breach of the terms of the charter party, and, consequently, not entitled to any compensation.

It will have been perceived from this statement that there is no dispute about the principal facts, although the damages to be awarded was an issue contested, and the questions involved are purely of law. It is quite evident that, in submitting to the jury simply the issue as to the amount the plaintiffs were entitled to recover, the learned justice presiding in the court below acted in strict accordance with his duty. It was really the only subject, as already suggested, about which there was any substantial difference

between the parties, and it was so conceded by the defendants' counsel at the trial.

Under general charter parties, where there are no special provisions, the obligation to load is absolute, and the person who hires the ship must pay for it "empty for full," a peculiar phrase which has crept into this branch of the law. This seems to be the universal rule. (Laws of the Trani, enacted in 1063, ch. XXV; 4 Bl. Book, Adm. p. 539.) Chapter LX of the "Consulate of the Sea," says of the merchant: "If he is not willing to load his goods, he ought to pay the whole freight to the managing owner." (3 Bl. Book Adm., p. 163.) See, also, Roccus de Navibus et Naulo, Ingersoll's Trans., Not. LXXIV; see, also, article XI of the laws of the Hanse Towns, which provides that, "the merchants are bound to load the ship by a prefixed time, on pain of paying the whole freight, notwithstanding the ship proceeds in her voyage light, and in her ballast only." (Appdix., 1 Pet. Adm., XCIX.) See, also, the French Ordinance of 1681 (Lib. 3, title 3, *Fret.*, art. 3); see, also, Desjardins Traite de Droit Com. Maritine (vol. 3, p. 595, Paris, 1882); see also, Mabynes Lex Mercatoria (p. 98). The same doctrine is asserted in Molloy De Jure Maritimo (8th ed., 1744, p. 255), namely, that "if a time be appointed by the charter party, and either the ship is not ready to take in, or the merchant is not ready to lade aboard, the parties are at liberty, and the party damnified hath his remedy against the other by action, to recompense his detriment."

This doctrine was also recognized in the federal courts in 1801, in *Giles* v. *The Cynthia* (1 Peter's Adm., 203, 207). In that case the court said: "If a merchant sends the vessel of another for cargo to a designated port and obtains none, he who hired the ship must pay empty for full."

See, also, *Ashburner* v. *Balchen* (3 Seld., 264), *Rupp* v. *Lobach* (4 E. D. Smith, 69, and the cases cited); Abbott on Shipping (7th Am. ed., 535 and cases cited); *Heckscher* v. *McCrea* (24 Wend., 310). And this rule would appear to be applicable when an unforeseen impediment arises, when no cargo is to be had, for in *Barker* v. *Hodgson* (3 M. & S., 267), cited the case of *Rupp* v. *Lobach* (*supra*), it was held that the prevalence of an infectious disease at the port, in consequence of which all public intercourse was prohibited, was

no excuse. (See, also, *Sjoerds* v. *Luscombe*, 16 East, 201·; *Bessey* v. ·*Evans*, 4 Campb., 131 ; *Randall* v. *Lynch*, 2 id., 356).

It will have been perceived that by the language of the charter it was provided that "lay days for loading and discharging should be ·as follows (if not sooner dispatched): Commencing from the time the vessel was ready to receive or deliver cargo at Turks Island to load, quick dispatch." And as stated by Chief Justice DALY of the Common Pleas, in the case of *Terjeson* v. *Carter* (reported in 9 Daly, 193), and the proposition is sustained by numerous authorities cited to maintain it, the word "dispatch," when employed in stipulations of this nature, means that the consignee is to take the cargo as rapidly as the vessel can deliver it. In *Sleeper* v. *Ping* (8 Reporter, 357) it was held that where the charter party provided for dispatch in unloading and delivering the cargo the charterer took the risk of any delay in obtaining a berth for the vessel, and was bound to take the cargo as rapidly as the vessel could deliver it. And Justice BLATCHFORD, in delivering the opinion of the court, said that in the absence of any provision, that the customs and rules of the port of Havana should control as to the time of discharging the cargo there, and because of the use of the word "dispatch" in the charter party, it must be held that the respondents were bound to take the cargo as rapidly as the vessel could deliver it. And it seems to be further established as a principle of law that if a master of a vessel, upon arrival at a place designated by the charter party, is advised that the cargo cannot be had he is not bound to wait but may sail immediately and can recover empty for full. (*Clarke* v. *Crabtree*, 2 Curtis C. C., 87.)

That case was one in which the charterer covenanted to provide and furnish a barque at Bonaire a full cargo of salt and to pay for the freight of the vessel fourteen cents per bushel custom-house measure. It also contained a covenant that the master was to use the vessel's funds in payment for the salt, which he was to purchase at the lowest cash price, and on the vessel's arrival at Boston the charterers were to pay him or his agents the invoice cost of the salt, export duty, if any, and interest on the amount invested in the purchase from Bonaire to Boston, and the Boston wharfage, all in addition to the freight. It appeared that the vessel went to Bonaire ; that the master was unable to purchase the salt owing to the failure

of the supply and returned to Boston in ballast. The question was whether, under the provisions of the charter party, he could recover for dead freight.

In that case the question here presented by the answer, and by the contention of the defendants here, was considered, viz., the impropriety of the master sailing without waiting for the cargo, which it was expected he could be supplied within a week after the time when he determined to sail, and did sail. It is said in the opinion of Judge CURTIS : It is objected that the master waited but twenty-four hours at Bonaire ; that if a master sails away without waiting the stipulated number of lay days, if the number is stipulated, or a reasonable number, if there be no stipulated number, he cannot recover for dead freight. And that the evidence showed three to five days is the usual, and therefore the reasonable number of days at Bonaire. But he said the evidence only proves three to five days, the ordinary time occupied in taking a cargo of salt on board there, not to wait to find a cargo, and if the master ascertained in less than twenty-four hours that by waiting three to five days he could not obtain a cargo he was not only not bound to wait, but he had no right to wait and impose the charge of lying there upon the charterers. That is exactly the difficulty of the defendants' contention in this case. The terms of the charter party relate not to delays occasioned by the absence of a cargo but in lading on board.

After the words "quick dispatch," to which allusion has been made, the charter party provides as follows :

"At New York to discharge fifteen hundred bushels per working day, and for each and every day's detention, by default of said party of the second part, or agent, forty U. S. C. dollars per day, payable day by day, shall be paid by said party of the second part, or their agent," etc.

But it is not necessary to invoke this strict rule for this case, because the master waited from the tenth to the seventeenth of September, after it had been certified by the defendants' agents that no salt was to be had at the island, and after it had been admitted that if he waited the largest number of days required for loading the ship stated by any witness, viz., a week, there would be no cargo for him to receive; and his departure was further predicated of the refusal of the agents of the defendants to guarantee a cargo in

two weeks or two months, or to make any extension of the charter, or by agreement to cover in a proper mode the delay which was asked in reference to the lading of the cargo, if one was ultimately obtained. It is to be considered, also, in regard to the question of remaining at Turk's Island for another week, as contemplated by the suggestion of Mr. Frith, that the vessel was at the island during what was called the hurricane' season, and would necessarily have been exposed to such disaster, by such additional delay, as might be occasioned by any of the elements distinguishing such a season.

The result of a consideration of the questions presented by this appeal, thus far considered, is, for the reasons stated, that the plaintiffs are entitled to recover. And it follows necessarily that none of the requests to charge which were refused, form any valid objection to the maintenance of the judgment rendered herein. The learned justice presiding in the court below refused to recognize such as were rejected, because they were not applicable to the facts in the case. And in this he was right, for the reasons stated herein. There was no cargo at the place of destination ; the master was under no obligations to proceed elsewhere to obtain it ; under the circumstances detailed he was not obliged to wait any longer than he did ; the contract on the part of the owners was fully performed, and the defendants failed to supply the cargo and failed to adopt any methods by which they put the plaintiffs or the master in default.

It has already been stated, that there was but one question of fact which it was thought necessary for the jury to pass upon, and this is founded in part upon the inquiry of the court after the testimony was closed, addressed to the defendants' counsel, viz., what question there was for the jury ; to which the defendants' counsel replied : " The question of damages." Upon the question of damages, the court after instructing the jury as to the methods · by which they should arrive at the amount to be determined upon to which the plaintiffs were entitled, said : " To recapitulate :

*First.* You have to get at the gross amount of freight ; that is, you are to determine how many bushels of salt would have constituted a fair cargo. That, at seven cents a bushel, will determine the gross freight. From such gross freight you will deduct the proper and legitimate expenses which the vessel would have been

**542** **STONE v. WOODRUFF.**

put to in performing her part of the charter with reference to the delivery of the salt, and for that balance you will give the plaintiffs a verdict. It is a pretty hard case all around. The defendants, however, in entering into the charter party, took the risk of there being salt at Turks Island when the vessel arrived there."

The learned justice also said: "It may be hard on them to receive no cargo, and yet to have to pay freight. On the other hand, the vessel was there in a trying position. There was no cargo nor any certainty of any within a reasonable time. The captain only exercised his legal rights under the peculiar circumstances in which he was placed, and the plaintiffs are entitled to their legal damages according to the truth of the case. What these damages ought to be, I will leave it to you to say under the instructions I have given you."

The instructions in reference to the amount and the mode of ascertaining it were correctly stated. In McLaughlin on Shipping (p. 545), the measure of damages in an action of non-performance, is said to be the loss arising from the breach of the contract; and further, the learned author says, in an action by the shipowner the amount of this loss is the amount of the freight under the charter party, deducting the expense of earning it and any freight actually earned by the ship during the same period. In this case there was no freight earned by the ship to be deducted, because there was no export, as we have already seen, from Turks Island except salt.

It is, therefore, the duty of the court to affirm the judgment. Ordered accordingly, with costs.

Davis, P. J., concurred.

Present — Davis, P. J., Brady and Dwight, JJ.

Judgment affirmed, with costs.