BENJAMIN HOWARD & others *vs.* FREDERICK W. MACONDRAY
& others.

Before the expiration of a charter party for a certain time, at a certain rate, payable
every six months in New York, and the "balance of the charter to be paid on the dis-
charge of the cargo at the final port of delivery," by which the charterer bound the
cargo to the performance thereof, it was agreed between the charterer and the owners
that the charter party should terminate upon the arrival of the vessel at San Francisco
and the payment to the owners there of the amount of a draft by the charterer upon
his agent there. *Held*, that upon the arrival of the vessel at San Francisco the owners
had a lien upon the cargo for the amount of the draft, as against a transfer of the
cargo, made by such agent to a third person to secure a preëxisting debt of the char-
terer, before such arrival, but after the draft had been presented to him, and he had
refused to pay it on the ground "that the funds upon which it was drawn had never
been received."

DEWEY, J.   The respective parties contest the right of prop-
erty in certain stores and merchandise shipped on board the Ship
Governor Davis, and landed at the port of San Francisco.   The
goods were shipped under a charter party executed by Enoch
Train & Co., of Boston, the owners of the ship, and J. Howard
& Son, of New York, shippers, for "the freighting and charter-
ing of said vessel from Boston to a port of lading in the United
States, thence to ports and places in the Pacific and elsewhere,
for fifteen months, with privilege to the charterers to continue
the time to thirty months;" "the ship to be delivered up at a
port in England or the United States."   The charter contains the
usual covenants on the part of the owner to victual, man, &c.;
and on the part of the charterers, to furnish cargoes, &c., and to
pay for the freight or charter of said vessel during said voyage
"two thousand dollars per month, commencing on the sixth day
of February 1850, during the voyage aforesaid and time em-
ployed, and in proportion for a less time," to be paid to the
owners or their order, in New York, semiannually, namely,
"twelve thousand dollars every six months from the commence-
ment of this charter;" "the balance of charter to be paid on
the discharge of the cargo at the final port of delivery."   And
"to the true performance of all and every of the foregoing cove-

nants and agreements, the said parties, each to the other, do hereby bind themselves, their heirs, executors, administrators and assigns, (especially the said party of the first part, the said vessel, her freight, tackle and appurtenances; and the said party of the second part, the merchandise and freight to be laden on board,) each to the other, in the penal sum of sixty thousand dollars."

The plaintiffs claim to hold the property by a transfer thereof to their agents in San Francisco, the avails to be applied to the payment of a preëxisting debt due them from J. Howard & Son, the shippers of the goods. The defendants claim to be rightful holders of the goods, as agents of Train & Co., and to hold the same and apply the avails thereof in payment of money due for the freight thereon.

Upon recurring to the charter party, we find by the stipulations therein contained that the first two instalments to be paid for freight were to be paid at certain fixed periods, one at the expiration of six months, and the other at the expiration of twelve months from the 6th of February 1850, and the payments to be made in the city of New York. The first of these having been duly paid, and the second, at the time of the alleged transfer to the plaintiffs, not being yet due and payable, and, when payable, to be paid at another place than San Francisco, if nothing else had occurred to change the relations of Train & Co. as to this property, and as to the right to hold the same by force of a lien for freight, no such lien would have existed; that is to say, if the charter party had, as was originally contemplated, continued for the term of fifteen months, the second instalment to be paid would not have been due by the terms of the contract, and the defendants could not, under a claim of lien for freight, have defeated a transfer of the goods by the shipper to a third person.

But the original purpose of the parties to continue the charter party for at least the period of fifteen months was subsequently, in October 1850, and before the alleged transfer of the goods and merchandise to the plaintiffs, rescinded by mutual consent; and it was agreed that the charter party should terminate at San Francisco, and that the sum of $12,000 should be there paid to

the ship-owners, they agreeing, upon payment of the draft to be given for this sum, to release all claims for freight beyond this sum, and that the charter party should be cancelled.

In pursuance of this arrangement, J. Howard & Son, the shippers and owners of the goods, drew on their agents at San Francisco for that amount, payable in fifteen days after sight. This draft was presented on the 12th of December 1850 to Raymond, their agent in San Francisco, on whom it was drawn, who declined paying the same; assigning, as the reason therefor, " that the funds upon which it was drawn had never been received."

Subsequently, on the 5th of January 1851, the vessel arrived at San Francisco, with the goods on board, and the agents of Train & Co., the ship-owners, claimed to hold the same for the payment of the $12,000 then due for freight.

The further inquiry is as to the effect of the new agreement of the parties for the termination of the charter at San Francisco, at an earlier period than that originally fixed for the payment of the second instalment for freight; and particularly whether any rights had intervened in the mean time in favor of the plaintiffs, which in law would operate to defeat the lien which might otherwise have attached to the goods on the arrival of the vessel at her final port of discharge, and a termination of the charter party.

This arrangement between the parties changed the place of payment to San Francisco. It also changed the time of payment to a period which in fact arrived before the vessel had reached San Francisco. The statement of Raymond, at the time of declining to pay the draft, shows his knowledge of the existence of this liability for freight payable in San Francisco, and of the funds upon which it was drawn. The proposal had been made by J. Howard & Son directly to Train & Co. to relinquish the charter party, and deliver up the ship at San Francisco. This proposal had been accepted by the ship-owners, upon the terms of paying $12,000 for the freight at San Francisco by a draft payable there, and when paid the charter was to be cancelled. The charterers, J. Howard & Son, under

date of December 20th 1850, in a letter addressed to Train & Co. alluding to the non-arrival of the Ship Governor Davis at San Francisco, say: " We trust our draft on Mr. J. W. Raymond will not be demanded until her arrival." That it was understood by both parties and their agents that the charter party was to terminate at San Francisco, and that in lieu of the $12,000, payable by the original contract in New York on 6th February 1851, that sum was to be paid in San Francisco in the manner already stated, we think is fully shown.

Upon the case thus presented to us, as to the lien claimed for freight upon the goods and merchandise of the Ship Governor Davis, it will at once be perceived that the present case differs in many particulars from that of *Raymond* v. *Tyson*, 17 How. 53. There was not in that case the provision, found in this charter party, binding the merchandise for the payment of freight— a provision which, although it may have no efficacy in securing a lien on the merchandise at the port of delivery, when by the terms of the contract the freight is to be paid elsewhere, and at a time different from the delivery of the cargo, yet may have its full effect in reference to freight to be paid at the place of delivery of the goods, and may operate and have full effect under the new stipulations entered into by these parties as to the time and place of making the second payment for freight. It furnishes evidence, at least, that the parties to the charter party intended to secure the usual maritime lien, which exists where not displaced by the existence of inconsistent stipulations, and should lead us very carefully to consider whether the usual maritime lien for freight did not exist upon this cargo at the port of delivery. It is to be borne in mind, that such lien will exist unless clearly displaced by the terms of the contract between the parties as to the payment of freight. That this clause in a charter party, binding the merchandise for the payment of freight, is not without effect, see *The Volunteer*, 1 Sumner, 551.

In the case of *Raymond* v. *Tyson*, it was attempted to apply the maritime lien to secure the payment of a sum stipulated to be paid in New York at a given day past, by enforcing a lien

on the merchandise delivered at San Francisco, a different place from that where the same was payable. In that case, a majority of the court held that no lien existed on the goods at the port of delivery.

In the present case, the original charter has the provision, " the balance of charter to be paid on the discharge of the cargo at the final port of delivery." It is true that by the original agreement the parties contemplated fifteen months, at least, as the duration of the charter party, and that the second payment for freight should be made at New York; and if this was the whole case, the doctrine of *Raymond* v. *Tyson* would preclude the enforcing of a lien, for a payment due in February 1851 at New York, upon these goods at their port of delivery at San Francisco in January 1851.

But the modification of the contract between the parties had materially changed the time and place of payment of the freight. It is said on the part of the plaintiffs, that this modification of the charter party was, on the part of Train & Co., contingent, and depending upon the payment of the draft for $12,000; and that not having been punctually paid, that the charter party, with all its provisions, remained in force, and thus left the second payment to be made in New York on the 6th of February 1851. We can hardly suppose that such was the purpose or understanding of the parties. It is true, that in the letter of Train & Co. to J. Howard & Son they say : " Upon payment of the draft for $12,000, the charter party will be cancelled." But we do not suppose that, if not paid at its maturity, the necessary consequence was to postpone all further liability to pay 'balance due for freight to the 6th of February 1851. The party who had drawn the draft had already failed in business, had requested the termination of his charter at San Francisco; and the other party had acted upon this request, and brought the same to a close at that port as the final port of delivery. Although the draft was not promptly paid by Raymond, the agent, yet we think this did not compel the ship-owners to treat the new arrangement for terminating the charter at San Francisco as a nullity; but that they might, upon the refusal of Raymond to accept and

pay the draft, upon the ground that the funds upon which the same was drawn had not been received, wait without prejudice till the arrival of the vessel.

While it is conceded that the maritime lien for freight may be considered as waived, when there are stipulations in the contract as to time and place of payment inconsistent with the existence of such lien, in the cases reported there seems manifested a strong disposition to limit this exclusion of such lien to cases plainly importing such exclusion. Thus it is said by Thompson, J., in *Ruggles* v. *Buckner*, 1 Paine, 363 : "As, by the general rules of law, the cargo is liable for the freight, it should be satisfactorily shown that the claim has been relinquished before the ship-owner can be required to part with the cargo without payment of freight."

Another principle which has been much regarded in the re ported cases is, that each particular case is to be decided, as to the question of the discharge of the lien, upon its own peculiar circumstances.

We are strongly inclined to the opinion that, upon the facts in the present case, the maritime lien was not displaced by any inconsistent stipulations of the parties as to the time and place of payment of freight. We think that the original stipulation for the payment of the freight at New York was, by mutual consent, changed to a promise to pay the same at San Francisco, and that the parties had made San Francisco the final port of delivery. If this be so, then no objection exists as to the place of payment being different from the port of delivery. But we put our decision of this case upon the whole evidence in the case, and, in connection with the question of maritime lien, have taken into consideration all the facts connected with the title of the plaintiffs.

As it seems to us, the proceeds of the cargo were appropriated to the payment of the freight due and payable at San Francisco, so far as the same was necessary, by the mutual understanding of the parties, and that fact was well known to Raymond, the agent of J. Howard & Son. When the draft for the $12,000 was presented, on the 12th of December 1850, he

44 *

declined paying the same, because "the funds upon which it was drawn had never been received by him;" thus clearly recognizing the property on board the Ship Governor Davis, not yet arrived, as the source from which funds were to be derived for paying the freight due thereon.

In this state of things, Raymond, although an agent of J. Howard & Son to transact their business at San Francisco, had no right on the 4th of January 1851, the day before the arrival of the vessel, to transfer the cargo to the agents of the plaintiffs, to be appropriated by them to the payment of a preëxisting debt due them from J. Howard & Son. There was no authority, on the part of Raymond, to divert these funds to the payment of preëxisting debts of third persons. It was, so far as appears, a proceeding wholly emanating from Raymond, and, as it seems to us, in direct violation of his duties, as communicated to him by his principals in their orders to pay the freight money due the ship-owners. Instead of applying the cargo to meet the payment of the draft for freight, on the day preceding the arrival of the vessel, he undertook to transfer the cargo to certain agents of the plaintiffs, the avails to be by them applied in discharge of preëxisting debts contracted by his principals elsewhere. Such a disposition of them was not within the scope of his authority, and cannot operate to defeat the rights of the ship-owners to have the same applied to the payment of freight stipulated to be paid to them at San Francisco.

Upon all the facts stated in the case before us, the court are of opinion that these stores and merchandise were held by the defendants, the agents of the ship-owners, under a right superior to that of the plaintiffs. *Judgment for the defendants.*

*C. P. Curtis & C. P. Curtis, Jr.* for the plaintiffs.

*F. C. Loring,* for the defendants.