### BAXTER et al. v. CARD.

(District Court, E. D. South Carolina. December 28, 1893.)

1. ACCOUNT STATED—"E. & O. E."—ACCEPTANCE OF NOTE FOR BALANCE.
   Under a charter party requiring payment in cash of the amount due the vessel, the charterer presented to the master, as he was about to sail, an

account with the ship, having on it "E. & O. E.," and gave him a note for the balance appearing thereon. *Held*, that acceptance of the note by the master did not preclude correction of the account for mistake.

2. SHIPPING—CHARTER PARTY—CHARTERER'S COMMISSIONS.

A charterer, who is agent for the ship at the port of loading, and obtains for her a full cargo, is entitled to commissions for loading stipulated in the charter party, although he was unable to make all the advances to the master agreed upon.

3. SAME—EXPENSES OF LOADING.

A provision of a charter party that the vessel shall pay "for loading, compressing cotton, and insurance at presses," includes compressing elsewhere than at the port of loading, of which the ship receives the whole benefit, and for which the charterer has made allowance in the freights paid by shippers at rates less then that fixed by the charter party.

In Admiralty. Libel by Harrison Baxter and George Gallilee, managing owners of the steamship Kendal, against H. St. Card, trading as Henry Card & Son, for breach of charter party. Decree for libelants.

Bryan & Bryan, for libelants.

J. N. Nathans, for respondent.

SIMONTON, District Judge. This is a libel for breach of charter party. The respondent entered into a charter party with the owners of the British steamship Kendal. By the terms of the charter party, the vessel was to be furnished a full and complete cargo of cotton from Charleston to Liverpool or Bremen, for five-sixteenths of a penny sterling per pound; sufficient cash for ordinary disbursements at port of loading to be advanced to the master by the charterer's agents, at current rates of exchange, steamer to pay 2½ per cent. commission thereon. Any difference between the amount of freight by the bills of lading, which the captain was authorized to sign at any rate of freight, and the freight fixed by charter party, was to be settled at the port of loading before sailing, and, if this were in favor of the vessel, was to be paid in cash, at current rate of exchange, less insurance. Eighteen working days were allowed for loading and demurrage, at the rate of six pence per net register ton, to be settled with the captain before the steamer left the port of loading; no claim to be valid if made after that time; steamer to pay for loading cargo, compressing cotton, and insurance at presses, $1.21 per bale, at loading port. The charter party was dated 20th July, 1892. The master reported himself to the charterer on 31st October, 1892, and the loading began on 1st November, ended on 28th November, and the ship cleared on 30th of that month.

The breaches charged are unnecessary delay in loading, causing demurrage for ——— days, in all $919.92; failure to furnish advances for necessary disbursements of the ship; failure to settle in cash the difference between the freight as per bills of lading and the rate of freight fixed by charter party, in all $6,457.25.

It appears from the evidence that the respondent, being charterer and agent of the ship, entered her in the customhouse, assigned her a berth, and proceeded to get a cargo for her. He began to make

advances, and did so to the amount of $527.53; but, having become embarrassed, he ceased his advances, and thenceforward paid none of the bills of the ship. This failure caused the master much embarrassment, and finally he was compelled to settle the claims against his ship by his own drafts, and after libels issued against her. On 30th November he cleared the ship himself. On that day, just as the ship was about to sail, the respondent presented him an account with the ship. In this account he credited the ship with freight, as per charter party, £4,301. 17s. 7d., and charged her with freight, as per bills of lading, £2,953. 16s. 2d.; leaving a balance due the ship of £1,348. 1s. 5d., ($6,457.25.) Against this balance he credited himself as follows:

| | |
|---|---:|
| By compressing and insurance, 3,050 B/C, at 76 cts. | $2,318 00 |
| Advances for disbursements. | 527 52 |
| Commissions and insurance on advances. | 254 80 |
| Brokerage, 3½%, as per charter. | 721 21 |
| Balance due ship. | 2,635 72 |
| | $6,457 25 |

The account has on it the usual letters, "E. & O. E."

Upon presentation of this account and examination thereof, the respondent gave to the master his note, at 60 days, to the order of the owners of the ship, for £645. 17s. 7d., ($2,635.72,) the balance appearing on this account. On the next day the proctors of the ship, by letter, advised the respondent that this note had been left with them by the master; that it could not be in settlement, because the charter party required such settlement to be in cash, and the master could not vary it. They also notified him that the settlement was made with the master at a time and under circumstances which gave him no opportunity of verifying it, and that the question of the amount of indebtedness was still open. The note has been tendered to respondent.

The first question we must meet is, was this settlement final? Whether we call this an "account stated," or an "account settled," it is open to correction for mistake, the burden being on the ship. Wiggins v. Burkham, 10 Wall. 132; Perkins v. Hart, 11 Wheat. 256; Chappedelaine v. Dechenaux, 4 Cranch, 306. There can be no doubt that the master, in receiving the note for the balance, instead of cash, varied the terms of the charter party, and for this he was without authority. Macl. Shipp. 138. We may treat the acceptance of the note as an admission of the correctness of the balance, subject to correction for mistake.

Of the items of the account, that for advances—$527.52—is admitted to be correct.

The item, "Commissions and insurance on advances," being estimated on disbursements not made or advanced by the respondent, is clearly an error, and must be eliminated from the account.

There are two items remaining, one for brokerage and commissions, 3½ per cent., as per charter party. The charter party provides that the steamer shall be consigned to the charterer's agent at port of loading, and be entered and cleared by them at the customhouse, paying the usual loading commissions, of 3½ per cent.

The respondent became agent for the ship, as well as charterer. There is no evidence showing that in this respect he did not do his duty by the ship. She obtained a full cargo, and until his means failed the respondent advanced for her. This item should be allowed,—$721.21.

The remaining item is: "Compressing and insurance, 3,050 B/C, at 76 cts.,—$2,318." The cargo of this ship came from the interior, compressed at the point of shipment in the interior. The respondent paid out no money for the compressing or insurance. He says that the compressing was allowed for in the rate of freights he gave the shipper, and thus, in a sense, he paid for compressing. He did not explain this, nor did he state the deduction or allowance in the rate. The custom is this: Cotton is engaged for a ship in uncompressed bales. It is for the interest of the ship that it be compressed. To this end the ship has the cotton sent to press, or authorizes or confirms this sending to the press, and pays for the compressing. As it thus constructively takes possession of the cotton which is in the press, and at its risk, it insures the bales while in press. The charter party makes a fixed allowance for this,—70 cents for compressing, and 6 cents insurance, per bale. These are charges for actual work and actual risk. The language of the charter party is: "Steamer to pay for loading, compressing cotton, and insurance at presses, one dollar and twenty-one cents per bale, at loading port." This is a stipulated sum now fixed by usage, and is made up, 45 cents loading, 70 cents compressing, 6 cents insurance. It forms a part of the consideration in fixing the rate of the charter. Libelants contend that the ship agrees to pay only for cotton compressed and insurance effected at the port of loading. But the compressing of the cotton was for the benefit of the ship. Her carriage capacity was largely increased thereby. And, as the charterer was obliged to accept freight rates below that provided in the charter party, the greater the number of bales, the greater his loss. Under these circumstances, when the charterer furnished cotton compressed, instead of cotton uncompressed, the ship received the whole benefit of it. Charter parties must be construed liberally, in furtherance of the real intention of parties and the usage of trade. Raymond v. Tyson, 17 How. 53. It would be a narrow construction of the charter party to say that the ship would be relieved from the burden, simply because the compressing was done elsewhere than at the port of loading. Counsel for libelants say that the ship cannot be made to pay for this compressing, because, having been done in the interior, there is no lien on her for it. The Paola, 32 Fed. 174. There would be no lien had the compressing been done in the port of loading. The Joseph Cunard, Olcott, 120. This libel is in personam, by the owners of the ship against the charterer. The charterer, having fixed the rate of freight, making allowance for compressing, is entitled to the provision of the charter party.

There is no evidence on the matter of demurrage. Respondent admits two days and one-half,—£95. 12s. 6d. Let this sum, reduced

to dollars and cents, be added to the decree; **and, when the necessary subtractions and additions are made, let judgment be entered for libelants for the result, with costs.**