## MANCHISA *v.* CARD.

*(District Court, D. South Carolina.* July 16, 1889.)

1. SHIPPING—DEMURRAGE.

A steam-ship was chartered to carry baled cotton or other lawful freight, the loading to be by a stevedore selected by the charterer, at the vessel's expense, and under the master's direction. She was to carry a full load, at fixed rates. Fifteen days were given for loading, lay days to begin 24 hours after written notice by the master to the charterer that she was in dock, ready for loading. On December 17th the master gave the charterer's clerk and agent proper notice of her readiness, and that the lay days would begin on the next day. The charterer's witnesses stated that either the master or super-

cargo said it would be necessary to get phosphate rock for ballast, but the officers mentioned denied the statement. The charterer provided rock, and caused it to be loaded as ballast. On the day after the notice was given the charterer replied to the written notice that the lay days could not begin until the ballasting was on board. The loading of the rock consumed several days, when, on December 27th, she began loading her cargo, which was finished January 17th. The vessel carried water ballast in her tanks, but did not fill the tank amid-ships, using it for cargo. *Held,* that as the master had no power to extend the time for the beginning of the lay days, and it was not shown that the phosphate rock was necessary to ballast the vessel, the time engaged in loading rock should not be deducted from the lay days, but demurrage should be allowed for the whole time above 15 days.

**2.** SAME—CARGO.

The charter-party having placed the loading under the master's direction, and provided that the charterer should not be responsible for stowage, the latter is not liable for failure to take a full cargo, resulting from defective stowage.

In Admiralty. Libel for demurrage.

*Barker, Gilliland & Fitzsimons,* for libelant.

*J. N. Nathans,* for respondent.

SIMONTON, J. The Bremena was chartered by the New York agents of the owners to Henry Card. The charter-party, dated 28th November, 1888, provided that the ship should go to Charleston, S. C., before December 31st, and there load for charterer, a full and complete cargo of cotton in bales, as usually shipped, or other lawful merchandise, not exceeding what she can usually carry. Freight, 13-32 penny sterling for cotton in square compressed bales. Other goods shipped to bear a full and fair proportion thereto. The charter-party is part of the pleadings, and may be referred to when required. The other provisions which need mention are these: Fifteen days (Sundays and holidays excepted) are allowed for loading cargo. Lay days to commence 24 hours after steamer is in dock, declared in all respects ready to receive cargo, her holds being clear, and written notice given by master to charterer. Demurrage, 6 pence per registered ton. Charterer may provide stevedore at vessel's expense. Stevedore to load under master's directions. Charterer not responsible for improper stowage. Such goods only as charterer may direct shall be received on board any part of the steamer. The steamer, if requested, to hoist goods on board with her steam-winches. All liability of the charterer under charter-party to cease when cargo is shipped; the owner, master, or his agents having an absolute lien on it for freight, dead freight, and demurrage. The steamer arrived at quarantine on 15th December. Came to her dock on 16th, (Sunday.) On 17th, Carroll, stevedore, selected by charterer, reported, and he and the master and supercargo walked down to Card's office. There the master and supercargo had some conversation with the son and partner of Card, and with his chief clerk, and a note was written by one of his clerks, signed by the master, notifying respondent that the vessel was in dock ready for cargo, and that the lay days would begin "to-morrow, 18th inst." The witnesses for respondent say that during this interview the master of the supercargo said that it was necessary to get 200 tons of

phosphate rock as ballast. Both the master and supercargo deny this. The rock was furnished by charterer. It was found that there was an excess of some 30 tons. At the request of the master these 30 tons were returned to the miners, the expense of transportation having been borne by the ship. On 18th the charterer replied to the written notice of the master, "that according to the charter-party the lay days cannot commence until ballasting is on board, and the steamer then tendered for cargo." The loading of the phosphate rock was finished about 24th or 26th December, and on 27th the steamer, without any further notice, began to load with cotton. She finished loading a mixed cargo of cotton, resin, and staves on 17th January. If her lay days began on 18th December, they expired on 4th January. If they began on 27th December, they expired on 14th January. Carroll was in charge as stevedore the whole time. He says that by delay of the ship in the matter of steam two days were lost. This was not denied. When the vessel was ready to clear, an account was made up by respondent, allowing but one day's demurrage, deducting from the lay days the days on which steam failed, and all the days consumed in loading rock. The master took these with him, examined them, brought them back, and settled on them. The next day he filed a written protest against their correctness. The ship carries water ballast in her tanks forward, aft, and amidships. When she took in the phosphate rock she did not fill the tank amid-ships with water, but used it for cargo. The rock paid freight at ballast rates, 7s. 6d. per ton. The ordinary freight rates of rock are 24s. to 27s. per ton. The charterer and the master disputing as to the accuracy of the accounts between them, the latter, under threat of a libel, settled. He now brings suit for 13 days' demurrage, and for the deficiency in a full and complete cargo, because of the improper stowage of the ship.

*Demurrage.* The lay days began 24 hours after notice in writing that the ship was in dock ready to receive cargo. This notice was given on 17th December. The charterer on 18th December by his letter denied that the "lay days could commence until the ballasting was on board and the steamer then tendered for cargo." This is not the language of the charter-party, and in fact the cargo was put in without any further tender. There is something connected with this phosphate rock that has not been developed. I have no doubt that the master and supercargo expressed a desire for it, and perhaps as ballast. But that it was to be furnished before the loading began, or that the lay days should not commence until all the rock was on board, could not have been contemplated by them. Such a conclusion is wholly inconsistent with the written tender of the ship made at the same time in Mr. Card's office, in the handwriting of one of his own clerks, and received without demur, qualification, or explanation by his partner and chief clerk, the very men who had conversed with the master and supercargo about the rock. Why was the phosphate rock asked for? Certainly not because it was absolutely necessary as ballast. The ship had already her provision for water ballast. Was it desired as a substitute for water ballast? If so,

why? Because it paid freight? This could not influence the master and supercargo. Every available space for freight in the steamer had already been hired to its charterer, and was his. The ship had no concern but to put cargo on board, and be paid for it at a rate fixed in the charter-party. Was phosphate rock put aboard in order to utilize the water-tank amid-ships for receipt of cargo? Both parties were interested in this,—the charterer, because it enlarged his freight-room; the master and supercargo, because it increased the amount of freight to be paid. Whatever view may be taken of this, there are some facts proved. The whole freight-room of the ship belonged to the charterer. No merchandise could go on board without his consent. He named the stevedore, and thus secured a witness for this. He was practically the owner of the ship for the purpose of loading her during the 15 lay days. He held under a charter-party with the owners, the terms of which the master had no power or authority to change. Macl. Shipp. 138. If the phosphate rock, as ballast, was absolutely necessary to make the ship seaworthy, of course the charterer could wait until the ballast was in. *Raymond* v. *Tyson*, 17 How. 53. If, however, it was not necessary; if it was put in because it paid freight; if it was put in in order to increase freight-room,—he could have forbidden it. His consent was absolutely necessary to it. As he did not forbid it, as in fact he furnished the rock without demur, we must treat him as assenting. More than this, we must treat it as his act, and the consequence resulting from it he must bear. Even if this be stating the case too strongly against him, the burden of proof is on him to show a good reason for postponing loading cotton cargo from 18th to 27th December. The contract between him and the owners of the ship, which, as we have seen, the master could not vary, provided for the commencement of the lay days 24 hours after written notice that the ship was ready. That notice was given; the lay days began. He did not load. The only thing that could excuse him is that the ship was not ready. The only reason for believing that she was not ready is the putting in of phosphate rock. If this was absolutely necessary, he is excused. If it was put in for the convenience of himself or of the ship, or of both, he cannot be excused because the consent of the owners to this variance of the contract is not shown. Was the phosphate rock absolutely necessary as ballast? The burden of proof is on the charterer. It has not been proved.

The rest of the claim is that she carried an insufficient cargo, below her capacity, and this through defective stowage. There was much testimony as to the capacity of the ship, and as to her tonnage, but the charter-party solves this question. The vessel was to be loaded by a stevedore selected by the charterer, but paid by the ship, and under the exclusive direction of the master,—the charterer not to be responsible for stowage. If she failed to carry as much as she ought to have done by reason of bad stowage, the charterer cannot be held. Nothing has been said of the settlement. If it was made under a mistake of fact, it will be opened. If it was the result of a change in the terms of the charter-party made between the master and the charterer without the knowl-

edge of his owners, it is void. Let the clerk estimate the number of days in excess of the lay days, allowing for the days lost by failure of steam in the winches, and the consequent demurrage.